IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| vs. | : | |
| | : | CASE NO. 13-0034-(GMS) |
| DMITRY USTINOV, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## UNITED STATES' SENTENCING MEMORANDUM

The United States of America, by and through the undersigned Assistant United States Attorneys, hereby files this Sentencing Memorandum.   The Pre-Sentence Investigation Report ("PSR") determined that Defendant has a guideline range of 46-57 months of imprisonment. Following his extradition from Lithuania, Defendant pled guilty to violating the Arms Export Control Act ("AECA") and the International Traffic in Arms Regulation ("ITAR"), which are designed to prohibit the export of sensitive high-tech military technology from the United States. Defendant's conduct in the present case directly caused sophisticated night vision devices and thermal imaging scopes, which are typically mounted to weapons, helmets, vehicles, and aircraft, to be illegally exported from the United States to Russia.   Given the seriousness of the offense, as well as the need to deter Defendant and other people from committing future similar crimes, the Government believes a low-end guideline sentence of 46 months is appropriate.

## I.      LEGAL STANDARD

The Third Circuit has required that post-*Booker*, a district court must follow a "three-step sentencing process."   First, the district court must "calculate a defendant's Guidelines sentence precisely as [it] would have before *Booker*."   *See United States v. Lofink*, 564 F.3d 232, 237-38

(3d Cir. 2009) (internal quotation marks and citations omitted).  Second, in doing so, it must "formally rule on the motions of both parties and state on the record whether [it is] granting a departure and how that departure affects the Guidelines calculation, and take into account [the Third] Circuit's pre-*Booker* case law, which continues to have advisory force."  *Id.*  And third, it must exercise its "discretion by considering the relevant [18 U.S.C.] § 3553(a) factors" in setting the sentence it imposes, regardless if that sentence varies from the sentence calculated under the Guidelines.  *Id.*  The Third Circuit has made clear that this three-step sentencing process remains in force after the Supreme Court's decision in *Gall v. United States*, 128 S.Ct. 586 (2007).  *See United States v. Wise*, 515 F.3d 207, 216 (3d Cir. 2008).  It has also noted that the district court must address any colorable arguments made by the parties at sentencing, before pronouncing its ultimate sentence.  *See United States v. Sevilla*, 541 F.3d 226, 232 (3d Cir. 2008).

In *Gall,* the Supreme Court required sentencing courts to consider all of the factors under 18 U.S.C. § 3553(a), including the Sentencing Guidelines, when undertaking this third and final step of the sentencing process.  In so doing, *Gall* required that a district court should not presume that the Sentencing Guideline range is reasonable and ruled that the court must make an individualized assessment of the sentence based on the facts presented.  *See Gall*, 128 S.Ct. at 596-97.  However, the court must use the Guidelines as a "starting point and initial benchmark," *id.* at 596, and must also "give serious consideration to the extent of any departure from the Guidelines," *id.* at 594.  *Gall* explained that district courts should do so because "even though the Guidelines are advisory rather than mandatory, they are . . . the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions."  *Id.*  If a district court ultimately decides that an outside-Guidelines sentence is

warranted, *Gall* held that the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance," noting that it is "uncontroversial that a major departure should be supported by a more significant justification than a minor one." *Id.* at 597.

## II.   THE UNDERLYING FACTS OF THIS CASE SUPPORT THE IMPOSITION OF A SENTENCE OF INCARCERATION WITHIN THE GUIDELINE RANGE.

For purposes of this sentencing memorandum, the Government will focus on the following three § 3553(a) factors, including: (1) the nature and circumstance and the seriousness of the offense; (2) protecting the public from future crimes by Defendant and other individuals similarly situated; and (3) the personal history and characteristics of Defendant, to support its position that a low-end guideline sentence is appropriate in this case.

### A.   The Nature and Circumstances of the Offense and the Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment For the Offense All Support the Sentence of Incarceration Recommended by the Government.   (18 U.S.C. §§ 3553(a)(1) & (2)(A))

The nature and circumstances of the offense conduct and the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law and to provide just punishment for the offense, all support the sentence recommended by the Government.  *See* 18 U.S.C. §§ 3553(a)(1) & (a)(2)(A).  In the present case, Defendant's conduct implicated serious national security considerations of the United States.   As a threshold matter, AECA and ITAR prohibit the export of high-tech military hardware outside the United States, because this technology is deemed critical to the national security and foreign policy interests of our country by the President. Ensuring that this technology is kept away from current and potential adversaries is critical to our national security interest and the safety and success of our service members in combat.   The

3

instant case involves the purchase and export of night vision devices and thermal imaging scopes from the United States to Russia – a country with a long history of interests that are adversarial to the United States.   Once these items were exported to Russia (and purportedly sold in Defendant's hunting store) this military technology could have been used anywhere in the world for a variety of purposes.

Moreover, a closer inspection of the specific defense articles at issue in this case also demonstrates the seriousness of Defendant's conduct.   The night vision and thermal imaging scopes listed in paragraph 12 of the PSR are considered Category XII defense articles on the U.S. Munitions List ("USML").   Category XII devices are "image intensification and other night sighting equipment or systems specifically designed, modified or configured for military use… and infrared, visible and ultraviolet devices specifically designed, developed, modified, or configured for military application." *See* 22 C.F.R. 121.1(a)(Category XII)(c).   Indeed, according to an affidavit prepared by the Department of Homeland Security, the specific devices at issue in this case are primarily used as weapon mounted or helmet mounted night vision devices. (*See* Excerpt of Extradition Affidavit to Lithuanian Government by Special Agent A. Zuchman at ¶ 18, Ex. A). Most of these devices were equipped with thermal night vision sensors that detect heat signatures at specific distances.   (*Id.*).   For example, the Flir Tau 640 cameras are thermal imaging cameras that operate at a speed of 30 hertz, which allows for a steady thermal picture at night from a fast moving vehicle or aircraft.   (*Id.*; *see also* summary of device from FLIR website, Ex. B, "FLIR TAU 2 Thermal imaging cameras offer unmatched set of features, making them well-suited for demanding applications like Unmanned Airborne Vehicles (UAVs), thermal

4

weapon sights, and handheld imagers.").[1]   Accordingly, it is critical that the United States enforces its export laws so that these devices do not fall into the possession of individuals or groups that seek to harm the United States or its allies.

Not surprisingly, given the sensitive nature of the defense articles at issue, Defendant's scheme was designed to avoid detection by law enforcement at each step in the process.   First, Defendant worked closely with a United States-based Supplier ("Supplier") to conceal his involvement at the point of sale.   Defendant's Supplier was fluent in English, and could purchase these defense articles domestically in the United States without raising any suspicions that the actual buyer was a Russian-national living in Moscow.   (PSR at ¶ 12-13).

Second, once a specific defense article was identified for purchase, Defendant wired money to the Supplier to purchase the defense article.   (PSR at ¶ 15).   Defendant's wire transfers, however, were also designed to conceal his involvement in the scheme.   The wires were typically conducted under the name of third party companies (*i.e.*, Yatima Investments or Darice Investments), and originated in off-shore accounts in Cyprus.   (PSR ¶ 18).   Indeed, in one conversation that was surreptitiously recorded by law enforcement, Defendant explained to the Supplier that he used the banking system in Cyprus so that, " I am sending [money] and I don't get highlighted, nobody knows what I have, what I sent and what we are doing."   (PSR at ¶ 18). Overall, the wire transfers totaled $80,990 for the purchase of these night vision devices and thermal imaging scopes, and demonstrated a level of sophistication by Defendant to protect his

---

[1] The Government is also attaching a photograph of an Insight Mini Thermal Monocular and a summary of the device's capabilities from the internet, as well as two photographs that show how this device is mounted to a helmet.   (*See* Ex. C, Photograph from Defendant's Email, Internet Summary, and Helmet pictures).   Similarly, the Government is also attaching a photograph from Defendant's email that depicts a D-740 night vision scope, as well as an image taken from the internet that depicts the proper use of this scope on a rifle.   (*See* Ex. D, Photograph from Defendant's Email and Internet picture of D-740 scope).

identity from law enforcement.

Finally, Defendant also took steps to disguise the contents of packages that were shipped to him in Russia. The Supplier typically falsely identified the contents of packages containing USML defense articles on customs' declaration forms so that customs officials from the United States and other countries would be less likely to search the package. (PSR at ¶ 15). Moreover, Defendant also discussed with the Supplier using less traditional methods to obtain and export these night vision devices outside the United States. For example, during one recorded statement, Defendant and his Supplier discussed misleading FLIR, a prominent manufacturer of night vision devices, into providing bulk sales of these devices by falsely claiming to be a legitimate dealer. (PSR at ¶ 17). During yet another conversation, Defendant discussed with the Supplier chopping up cars and hiding the devices into various car parts to elude American and foreign based customs officials. (*See id.*). At no time, however, did Defendant ever apply for or receive a license to export these devices from the U.S. Department of State.

Overall, these facts demonstrate that the conduct engaged in by Defendant was not only serious, particularly as it relates to the national security interests of the United States, but displayed a certain sophistication for concealing the movement of money and causing sensitive USML defense articles to be illegally exported outside the United States. Therefore, this conduct favors a sentence at the low-end of the guideline range.

**B.     The Need For the Sentence Imposed to Protect the Public From Further Crimes of the Defendant Also Supports the Sentence of Incarceration Recommended by the Government. (18 U.S.C. §§ 3553(a)(2)(B) & (c))**

The need to afford general and specific deterrence also supports the sentence recommended by the Government. *See* 18 U.S.C. §§ 3553(a)(2)(B) & (C). There is a strong need to deter Defendant and other people from engaging in future conduct similar to the instant

6

case.   The restrictions on exporting sophisticated military-grade equipment set forth in AECA and ITAR make these products substantially more valuable when they cross the United States' borders – particularly because these items can be mounted on weapons, helmets, vehicles, and aircrafts, such as UAVs.   Thus, individuals (like Defendant) can make a substantial amount of money selling these high-tech military-grade items outside the United States despite our laws.   Indeed, the seriousness of this offense is why the Government sought Defendant's extradition in this case from Lithuania in the first instance.   Therefore, the Government respectfully submits that a 46 month prison sentence sends an appropriate message not only to Defendant (who may be considering reopening his business in Moscow), but also to other individuals that are observing this case and contemplating similar illegal acts.[2]

### C.     The History and Characteristics of the Defendant Also Supports a Sentence of Incarceration Recommended by the Government.   (18 U.S.C. §§ 3553(a)(1))

Finally, it must be noted that Defendant does not have any criminal history – though the U.S. probation office is not privy to any potential violations he may committed in his native country.   18 U.S.C. § 3553(a)(1).   While this is an important fact, the Government would also note that the conduct in this case occurred for nearly three years, and involved numerous different USML defense articles.   Thus, the Government believes that despite Defendant's lack of criminal history, this fact must be balanced against the seriousness of the offense, the nature and

---

[2] A Google search of Dmitry Ustinov's case reveals that his case has attracted press coverage – particularly overseas.   Accordingly, general deterrence is a legitimate concern raised by the Government.   *See* (1) "Russia Fights Ustinov Extradition to U.S. for Arms Trial," http://www.bloomberg.com/news/2013-05-27/russia-fights-ustinov-extradition-to-u-s-for-arms-trial.html; (2) "Russian national pleads guilty in US to illegal military gear exporting," http://rapsinews.com/judicial_news/20140711/271708217.html; (3) "Russian pleads guilty in technology export case," http://www.washingtontimes.com/news/2014/jul/10/russian-pleads-guilty-in-technology-export-case/.

circumstances of the offense, and the need for deterrence, all of which favors a low-end guideline sentence.

**III.     CONCLUSION**

For the reasons set forth above, the Government respectfully requests that the Court sentence the Defendant to a prison term of 46 months, which represents the low end of the recommended sentencing guideline range.

Respectfully submitted,

CHARLES M. OBERLY, III
UNITED STATES ATTORNEY

By:     _____

Jamie M. McCall
Assistant United States Attorney

8

# Exhibit A

## AFFIDAVIT IN SUPPORT OF THE REQUEST OF THE EXTRADITION OF DMITRY USTINOV

I, Alex Zuchman, Special Agent with the United States Department of Homeland Security, Homeland Security Investigations ("HSI"), being duly sworn, do hereby depose and state as follows:

1.      I am a citizen of the United States and a resident of the Commonwealth of Pennsylvania.

2.      I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI"). I have been a Special Agent since September 2004. Prior to that, I was a United States Marine Corps Officer. My duties and responsibilities as an HSI Special Agent include investigating the illegal exportation and transfer of U.S. military weapons, high technology, and commodities.

3.      In the course of my duties as a Special Agent, I have become familiar with the facts surrounding the investigation of the criminal activities of Dmitry USTINOV. The information in this affidavit is based on my personal knowledge, including my review of business records, e-mails, transcripts of recorded internet-based Skype calls, interviews of witnesses, and observations, as well as information provided to me by other law enforcement officers.

## MILITARY USE FOR DEVICES ILLEGALLY EXPORTED

18.     The devices listed in the Indictment are considered Category XII defense articles on the U.S. Munitions List.  Category XII devices are image intensification and other night sighting equipment or systems specifically designed, modified or configured for military use; second generation and above military image intensification tubes specifically designed, developed, modified, or configured for military use; and infrared, visible and ultraviolet devices specifically designed, developed, modified, or configured for military application.  Specifically, the devices listed in paragraph 5 are primarily used as weapon mounted or helmet mounted night vision devices. Most of these devices are equipped with thermal night vision sensors that detect heat signatures at specific distances.  The Insight Mini Thermal Monocular is issued to the United States Armed Services.  The FLIR TAU 640 cameras (listed in paragraph 11) are thermal imaging cameras that operate at a speed of 30 hertz, which allows for a steady thermal picture at night from a fast moving vehicle or aircraft. These devices are typically mounted to either a vehicle or aircraft. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (UAV).  According to FLIR (the manufacturer), mounting these devices to UAVs to provide steady thermal pictures while flying is

consistent with their application.

Alex Zuchman, Special Agent
U.S. Department of Homeland Security
Homeland Security Investigations

Sworn and subscribed
to before me this _____ day
of April, 2013.

The Honorable Mary P. Thynge
United States Magistrate Judge

14

# Exhibit B



Search

Home     Products     Resources     Store     Contact Us

Home > Cores & Components > Uncooled Cores

**Cores & Components**

**LWIR Camera Cores**
- Lepton
- Muon
- Quark 2
- Tau 2
- Tau 2 Low Res
- PathFindIR II

**MWIR Camera Cores**

**SWIR Camera Cores**

**Lasers & Trackers**

**ROICs & Components**

**Resources**

**Knowledge Base / FAQ**

**Contact Us / Request Info**

**Share FLIR**

Share on Facebook

Tweet this

Share email this

More Share & bookmark

**Tau Feature Comparison**
Learn more about the evolution of features in FLIR's Tau LWIR uncooled camera cores.
Check out the Comparison Chart

## Tau 2 Uncooled Cores



Tau with a 19mm Lens
Click to see more lens options

Lens Options

7.5mm
9mm
13mm
19mm
25mm
35mm
50mm
60mm
100mm



**Tau with 7.5mm lens**
Mouse over lens options
to see image change

Description   Export   Specs   WFOV Optics   NFOV Optics   DRI   Applications   Documents   Videos

### Tau 2 LWIR Thermal Imaging Camera Cores

FLIR® Tau® 2 thermal imaging cameras offer an unmatched set of features, making them well-suited for demanding applications like Unmanned Airborne Vehicles (UAVs), thermal weapon sights, and handheld imagers. Improved electronics now give Tau 2 even more capabilities, including radiometry, increased sensitivity (<30mK), 640/60Hz frame rates, and powerful image processing modes that dramatically improve detail and contrast. Since the electrical function are common between the Tau 2 640, 336 and 324, integrators have direct compatibility between the different camera formats, and Tau camera versions share many of the same lens options.

New features:

- 2nd generation Digital Detail Enhancement™
- Active Contrast Enhancement™
- Smart Scene Optimization™
- Information Based HEQ™ that automatically adjusts AGC
- Silent Shutterless NUC™
- Accurate temperature measurement for radiometry, analytics and telemetry

There is no difference in form or fit between Tau 2 and the first generation Tau cameras. The upgraded Tau 2 electronics enable additional functions and capabilities that are planned for release on a periodic basis. A comparison of the Tau2 version evolution can be found here: Tau Feature Comparison. Note that earlier versions of Tau (1.X) cannot be upgraded to the newer Tau 2 configuration.

FLIR also offers three low-cost Tau 2 options for applications that do not require high resolution imaging:

- Tau2 160 a 160×128 with 25 μ-pitch
- Tau2 162 a 160×128 with 50 μ-pitch
- Tau2 168 a 160×128 with 34 μ-pitch

Download the FLIR Camera Controller GUI

Copyright © 1999-2014 FLIR Systems, Inc.          Images/content are for illustration purposes only.          Privacy Policy Copyright Policy Terms of Use

# Exhibit C



Case: 1:13-cr-00634-GMS    Document #: 45    Filed: 09/25/14    Page 17 of 23 PageID #: 182











## Insight MTM (AN/PAS-23) w/ Visible Laser

Mini Thermal Monocular w/ Visible Laser Pointer

Like  2 people like this. Sign Up to see
      what your friends like.

### $14,535.00

Add to Cart  1

    Insight Technology's Mini Thermal Monocular (MTM) is one of the smallest, handiest thermal imagers on the market. Its lightweight polymer body housing fits very comfortably in your hand and is small enough to keep in a pocket. The simple controls are intuitive and operated with few buttons, making the MTM easy to pick up and use by novice operators. The controls are ergonomically laid out and place buttons, literally, at your fingertips. The unit can be fitted with optional accessories making it helmet mountable or adding a magnified lens, extending its capabilities. The inclusion of an integrated visible laser pointer increases functionality exponentially. This feature allows you to point out or mark targets or areas of interest to others when stealth is not a mission requirement. The visible laser version especially lends itself to public safety applications and search & rescue missions.

We are very pleased to be offering the Insight Tech-Gear MTM. This incredibly handy thermal imaging monocular features a highly advanced thermal engine that provides some of the best resolution and imaging we have seen to date. This sort of technology is to be

expected from a company like Insight who has a long history of providing high quality gear to America's Warfighters and Law Enforcement Professionals. But, the MTM really shines in its physical characteristics. The unit is the smallest and lightest thermal imager on the market, making it perfect for long operations in the field where every ounce counts. The ability to mount the MTM on a helmet is extremely beneficial for direct action missions where your hands will be needed elsewhere. The MTM also offers built-in image capture, allowing you to employ it like a camera. The images are downloaded to any PC using an included USB cable. The MTM is a truly multi-functional thermal imager that is perfect for reconnaissance, surveillance, and search & rescue missions.

This MTM meets the MilSpec for water resistance and screen pixel quality. It features helmet mount capability, an image/video capture interface and demist shield.

**Export of Thermal Imaging Equipment or related accessories (such as manuals) is strictly regulated by the US Department of State in accordance with the guidelines of the International Traffic in Arms Regulations (ITAR). It is a major crime to ship or carry US manufactured thermal imaging devices outside the borders of the United States, punishable by fines and prison sentences. Ignorance of these regulations will not hold up in court. By purchasing thermal imaging equipment from TNVC, you attest that you will not attempt to export or carry this thermal imaging equipment outside the borders of the United States. Also, it illegal to allow a non-US Citizen to look through US Thermal Imaging Equipment, even on US soil. Again, this is a crime punishable by fines and prison sentences.**

Manufacturer:
Insight Technology
Dimensions:
5.0"(L) x 2.8"(W) x 2.2"(H)
Weight:
11.5oz.
Finish:
Matte Black, Corrosion Resistant
Power:
Two (2) DL123 Lithium Batteries
Battery Life:
3 Hours Continuous
Submersible:
66'
Warranty:
1 Year Warranty
THERMAL SPEC:
_____

Sensor:
Vanadium Oxide Uncooled Microbolometer
Detector:
320×240, 25um Pixel Pitch
Image Size:
640×480 2D Interpolated
Sensitivity:
50mK-55mK
Spectral:
7-14um
Frame Rate:
60 Hz, 60 Hz
Objective:
19mm Germanium
Polarity:
White Hot/ Black Hot
FOV:
23.4 Horizontal, 17.6 Vertical
Display:
OLED 640×480 Active
Diopter:
+6 to -6
Video Out:
Analog RS-170
OPTICAL:
_____

ID Human:
400 Meters (Standing), 500 Meters (Moving), 25 Meters (Facial ID)
Capture:
160 Images
Calibration:





Exhibit D



36

